FILED

2017 Nov-20  AM 10:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

VICTOR JOSEPH RUSSO,             )
                                 )
        Plaintiff,               )
                                 )
v.                               )        Case No. 2:17-cv-01005-KOB-JEO
                                 )
JEFFERSON S. DUNN, et al.,       )
                                 )
        Defendants.              )

## REPORT AND RECOMMENDATION

The plaintiff has filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 alleging violations of his rights under the Constitution or laws of the United States. (Doc. 1). The plaintiff names the following defendants in the complaint: Governor Kay Ivey, the Alabama Department of Corrections ("ADOC"), Prison Commissioner Jefferson Dunn, Warden Dewayne Estes, Warden Specks, Classification Specialist Estell, Lt. Northcutt, Captain Carol Graham, Captain Malone, Warden (formerly Captain) Kenneth Peters, "all unknown correctional[] officers assigned, on the date of the incident [April 20, 2016,] to work P2 Dorm, the cube of said dorm, supervisors on the shift, . . . at all times preceding the incident and the filing of this action." (*Id.* at 3, 17).

The plaintiff seeks criminal prosecution of all defendants, compensatory and punitive damages from some of the defendants and "any relief that may become

available through the course of litigation." (*Id.* at 48-49). He purports to "reserve[e]" the opportunity "to change, amend," or "alter" his requests for relief. (*Id.* at 48). In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

## I. Standard of Review

The Prison Litigation Reform Act, as partially codified at 28 U.S.C. § 1915A, requires this court to screen complaints filed by prisoners against government officers or employees. The court must dismiss the complaint or any portion thereof that it finds frivolous, malicious, seeks monetary damages from a defendant immune from monetary relief, or which does not state a claim upon which relief can be granted. *Id.* Moreover, the court may *sua sponte* dismiss a prisoner's complaint prior to service. *See* 28 U.S.C. § 1915A(a).

Under § 1915A(b)(1) and § 1915(e)(2)(B)(i), a claim may be dismissed as "frivolous where it lacks an arguable basis in law or fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A claim is frivolous as a matter of law where, *inter alia*, the defendants are immune from suit or the claim seeks to enforce a legal right that clearly does not exist. *Id.* at 327.

Moreover, a complaint may be dismissed pursuant to 28 U.S.C. § 1915A (b)(1) for failure to state a claim upon which relief may be granted.  A review on this ground is governed by the same standards as dismissals for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007).  In order to state a claim upon which relief may be granted, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and must be a "'plain statement' possess[ing] enough heft to 'show that the pleader is entitled to relief.'" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 557 (2007) (alteration incorporated).   But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.  Similarly, when a successful affirmative defense, such as a statute of limitations, appears on the face of a complaint, dismissal for failure to state a claim is also warranted.  *Jones v. Bock*, 549 U.S. at 215.

*Pro se* pleadings "are held to a less stringent standard than pleadings drafted by attorneys" and are liberally construed. *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006).  However, they still must allege factual allegations that "raise a

right to relief above the speculative level." *Saunders v. Duke,* 766 F.3d 1262, 1266 (11th Cir. 2014) (internal quotation marks omitted).

## II. Factual Allegations

Prior to setting forth the allegations made the basis of his complaint the plaintiff provides some history concerning a conflict between him and several other St. Clair Correctional Facility ("SCCF") inmates that began in 2013. (Doc. 1 at 20). He declares "these facts are for the purpose of establishing the truth and not an attempt to undermine the statute of limitations" as the injury underlying his claims did not occur until 2016. (*Id.* at 20 n.1).

In the Summer of 2013 Officer Baldwin would not honor the plaintiff's shaving profile. (*Id.* at 20). When the plaintiff refused to shave with a razor, Baldwin, who is black, told him "that since he wanted to be a smart mouth cracker she was going to make sure he got was he was looking for." (*Id.*). The plaintiff was removed from SCCF's honor dorm for failure to obey a direct order and sent to M-1 Dorm. (*Id.*).

Within an hour of being transferred to M-1 Dorm, and while he was unpacking, inmates Murk, Blood T (a.k.a. Edward Carrington), and Grigg stepped into the plaintiff's cell with prison made knives and robbed him of "his personal property of store items." (*Id.* at 20-22). After the inmates left, the plaintiff gathered up his remaining property and told Officer Walker "to let him out of M-1

4

dorm." (*Id.* at 21).   When Officer Tish arrived, the plaintiff told him what happened and asked to be moved to a safer dorm, but did not reveal the inmates' names as a safety measure. (*Id.*).   The plaintiff also told Tish the inmates who robbed him were "high on amphetamines or methamphetamines." (*Id.*).

Officer Tish escorted the plaintiff to the shift office where he repeated the robbery story to Shift Supervisor Graham and explained why he would not identify the inmates by name. (*Id.*).   Supervisor Graham accused him of lying, "locked him up[,] and charged him with creating a security, safety, health hazard." (*Id.*).   As soon as the plaintiff arrived in the segregation unit, he told Captain Malone about the robbery incident and identified the inmates who committed the crime. (*Id.* at 21-22).   Captain Malone told Supervisor Graham about the plaintiff's statement. (*Id.* at 22).   In response, Graham called the inmates into her office and questioned them. (*Id.*).   When the inmates denied the accusation, Graham sent them "back to their dorm without [doing] anything further." (*Id.*).

Despite the plaintiff's honesty, he received a disciplinary infraction for creating a security hazard. (*Id.*).   However, the Enemy Validation Committee, consisting of three SCCF employees, did investigate his robbery complaint. (*Id.* at 22, 32).   During the typical Enemy Validation investigation, the committee or one of its member's questions "the alleged enemies . . . and discloses the allegations provided them by the other inmate, including the inmate's name." (*Id.* at 32).

ADOC's enemy validation policy does not provide for victim confidentiality. (*Id.*).

As a result of the investigation, inmates Murk, Blood T and Grigg were validated as the plaintiff's enemies. (*Id.* at 22). Once the three inmates were placed on the plaintiff's enemies list, ADOC policy and SCCF SOP required the inmates to be separated. (*Id.* at 29, 31). This was accomplished by placing one inmate in segregation (the plaintiff). (*Id.*). During the plaintiff's stint in segregation, enemies Murk and Grigg were transferred to other institutions. (*Id.*). Only Blood T, who was known by "SCCF staff and or the entire administration as the leader of a set of the Blood gang," remained at SCCF. (*Id.* at 22).

"[A]fter his punitive time in segregation was over," the plaintiff declares he was "intentionally deprived of placement in Protective Custody," as set forth in Administrative Regulation 435. (*Id.* at 32). He infers that had he not been given the disciplinary infraction, protective custody would have been an available option. (*Id.* at 40). Protective custody would have allowed him "available privileges such as visitation, store (canteen), shower[] items, goods, public access (newspapers etc.), books and radio." (*Id.* at 41). Instead, he was housed in administrative segregation where none of these privileges was available. (*Id.*). The plaintiff remained in administrative segregation until April 2014, a placement he perceived to be punishment for reporting his own victimization. (*Id.* at 33).

With the foregoing history in mind, the plaintiff turns to SCCF itself and the general population conditions between 2015 and 2016. SCCF is a maximum security institution "where some of the most violent [male] criminals" are housed. (*Id.* at 24). SCCF houses both capital offenders "and various other violent offenders to lower level crimes, all [of whom] are in general population, except those placed in segregation." (*Id.*).

Between 2015 and 2016 there were about 1000 SCCF inmates in general population and 240 inmates in segregation units. (*Id.*). Violent criminal offenders were housed in general population dorms J through Q, each dorm having approximately 192 inmates. (*Id.* at 24). The dorms were "overcrowded" and operated at "over double . . . designed capacity." (*Id.* at 39). Inmates outnumbered corrections officers "20 to 30 (if not more)" to one. (*Id.*).

Supervisory ADOC officers know which security post assignments "MUST be filled on each shift, from the greatest to the least," and know that "security assignments cannot be 'abandoned,' 'left,' nor neglected without a relieving rover." (*Id.* at 25-26). Yet, "at all times preceding the filing of" the plaintiff's complaint SCCF remained "underfunded" and severely "understaffed." (*Id.*). The plaintiff contends the supervisory officers did not make reasonable attempts to ameliorate underfunding and understaffing. (*Id.* at 27).

In SCCF's general population living quarters the cell doors were dysfunctional, "unsecure, non-lockable and could be opened at any time by 'any' inmate from either 'inside or outside of those cells.'" (*Id.* at 24). Prison officials had "no form of monitoring the inmates visually except by employees assigned to work in the Dorm, cubes," or in living areas where inmate movements were plainly visible. (*Id.* at 25).

As a matter of "unwritten policy, practice" or "custom," officers "assigned to work" inmate living quarters were "not properly trained," Administrative Rules and Regulations involving an officer's "tour of duty and conduct" were not enforced, and officers were not disciplined for falsely reporting that they had conducted searches of inmates, cells, and common areas. (*Id.* at 27-28). The ADOC Security Threat Group (STG) failed to provide adequate "protection and safety to non-gang members." (*Id.* at 40). ADOC defendants did not properly investigate "within" their "limited power to so do acts of violence," did not accurately report the "uncontrolled level of violent acts by inmates-on-inmates," or ensure "violent crimes committed by inmates [were] prosecuted." (*Id.* at 27-28).

In this environment, "unmanaged gang activities" proliferated. (*Id.* at 39). "[D]rugs, cell phones, and other contraband" allowed inmates addicted to drugs to "acquire debts" and "health hazards," and to commit "acts of robbery . . . to purchase drugs and or cell phones[.]" (*Id.* at 39-40). The environment caused

"90% of [SCCF] deaths and assaults," and the "vast majority of stabbings involved enemy situations '<u>KNOWN</u>' by SCCF security staff and or employees." (*Id.* at 40-41).

SCCF employees were unable "to gain control of" the violence because of poor management in all departmental offices within the prison. (*Id.* at 25). For instance, despite repeated inmate-on-inmate murders, high levels of inmate-on-inmate violent crimes, and high levels "of contraband contributing to such violent crimes" in the general population dorms, SCCF employees did not seek to install a visual monitoring system. (*Id.* at 25). Although it was obvious to ADOC "security officers, staff, and or supervisors," including Wardens and Captains, that the "'key control'" to inmate cell doors had to be operational, no reasonable measures were taken to correct the dysfunctional key controls. (*Id.*). The Wardens had the discretion to "implement a Standard Operating Procedure for protecting the identity of inmates" who inform "SCCF employees and or staff of criminal acts performed against them" but they "neglect[ed]" to do so, which "caused death" and "deadly assaults." (*Id.* at 31).

The plaintiff refers to a law suit filed by the Equal Justice Initiative concerning SCCF safety and security lapses. (*Id.* at 26). The lawsuit appears to be *Mark Duke, et al., v. Jefferson Dunn, et al.* Case No. 4:14-cv-1952-VEH (N.D. Ala. filed Oct. 13, 2014) ("*Duke*"). The undersigned takes judicial notice of the

case, which is a proposed class action by current and future SCCF inmates.  *Id.*
doc. 53 at 3-4 (second amended complaint filed Aug. 28, 2015).

The proposed class plaintiffs in *Duke* have set forth a number of conditions
of confinement claims.  *Id.* at 6-75.  Among them are Eighth Amendment claims,
the underlying basis of which are the defendants' deliberate indifference to
pervasive, uncontrolled high levels of inmate-on-inmate violence, chronic security
failures, and the defendants' refusal to take reasonable measures to abate the
substantial risk of harm to inmates.  *Id.* at 23-59, 70-73.  Although the plaintiff
cannot rely on the pleadings in *Duke* to state constitutional claims in this action,
the undersigned does report that the plaintiff himself is one of a number of *Duke*
inmate exemplars to inmate-on-inmate violence because of inept security at SCCF
between 2012 and 2015.  *Id.* at 28, 35.  The allegations concerning the plaintiff as
set out the *Duke* second amended complaint are as follows.

> In August 2014,[1] Victor Russo, who is 52 years old, was moved
> out of the honor dorm for an alleged shaving infraction.  He moved
> into his new block and soon after was accosted by three younger
> inmates armed with knives who robbed him.  When Mr. Russo
> reported the robbery to correctional staff, Captain Sanders suggested
> he get a knife to protect himself.

*Id.* at 35.

---

[1] In this case, the plaintiff alleges this event occurred in the Summer of 2013.  (Doc. 1 at 20).

> In May 2015,[2] Victor Russo was robbed and assaulted shortly after returning from the prison store to his cell.  Multiple prisoners were able to open his cell door and enter his cell because the door had a broken locking mechanism.  They attacked Mr. Russo, who is 52, and stole all of his store items.  He suffered facial injuries requiring treatment at UAB Hospital.

*Id.* at 28.

In the action *sub judice*, the plaintiff alleges "SCCF employees have by pattern" and history failed "to act to remedy clear Federal violations" and "totally disregarded their legal duties to provide adequate and reasonable measures of safety and due care of inmates housed therein."  (Doc. 1 at 26).  He contends "SCCF" fails to:

> a.     Compel its employees to comply with state and federal law relating to safety of inmates;
>
> b.     [R]eport truthfully the uncontrolled level of violent acts by inmates-on-inmates;
>
> c.     Inform Headquarters, Governor, [or the S]tate [L]egislature of the inadequate security having rose to a deadly level requiring immediate attention where [there is] a major d[y]sfunction with cell doors;
>
> d.     Enforce[] Administrative Rules and Regulations involving the tour of duty and conduct of employees;
>
> e.     Report to [the S]tate [L]egislature the severity in understaff[ing] and how it contributes to the undue hardship of employees and uncontrolled acts of violence;

---

[2] In this case, the plaintiff alleges this incident occurred on April 20, 2016.  (*Id.* at 36).

     f.    Ensure employees assigned to work living quarters of inmates are disciplined for falsely reporting [that they have conducted] searches of inmates['] persons, cells and common areas;

     g.    Meet with headquarters about underfunding;

     h.    [Properly act on] reported acts of violence and or crimes by inmates neglecting them;

     i.    Separate inmates by transferring those with validated enemies rather than keeping them in the same institution;

     j.    Properly train employees to maintain control and order over inmate[] living quarters;

     k.    Investigate adequately, properly, within the limited power to do so act[s] of violence;

     l.    [E]nsure violent crimes committed by inmates are prosecuted in accordance with the penal laws of the state; and

     m.    Remove and or cause to be fired from employment with ADOC at SCCF, [or otherwise transfer], 'employees who [the plaintiff] informed of the true facts, circumstances, and situation, to include the names of the inmates, 'before' [he was] violent[ly] assault[ed], but fail[ed] to provide [the plaintiff] safety in the least intrusive way, which said employees could have prevented but for their lack of due care, exercise of available administrative authority, power and duties, coupled with their not being afraid of suffering investigation, infractions, or ever questioned, knowingly put [the plaintiff's] life in threat of los[s] deliberately.

(*Id.* at 27-28). The plaintiff adds that "SCCF Wardens lack the professional ability to gain control [of the prison] without outside assistance." (*Id.* at 28-29).

Turning back to the case at hand, the plaintiff does not describe his housing status between May 2014 and November 2015, but it is clear he was segregated

some of that time because he states "Blood T stabbed another inmate and was locked up" in November 2015, and this made it possible for him to be released to population.  (*Id.* at 23, 29-30).[3]  The same month "several Blood Gang members opened" the plaintiff's cell door and asked him, "'do you want to be like Birdman,'" an inmate who had been "murdered about a month earlier because he had an enemy on his list and would not sign forms to retract" the enemy "so that the enemy would be let "out of lock-up."  (*Id.* at 30).  The gang members told the plaintiff to tell SCCF staff that he "owe[d] a storeman and can't pay so" corrections officers would lock the plaintiff up "and let Blood T out of lock-up." (*Id.*).  The gang members then forced the plaintiff to pack his belongings.  (*Id.*).

While the unusual number of inmates was gathered in, around, and about the plaintiff's cell, there was no corrections officer "in the dorm, on the floor," or "within sight."  (*Id.*).  The plaintiff asserts that "truth told, SCCF at this time was so uncontrolled" that corrections staff were "more afraid and fearful than the inmates to intervene in what looked of danger."  (*Id.*).

Having endured Lt. Graham's and Captain Malone's responses to the Summer 2013 incident with Blood T, Murk and Grigg, the plaintiff feared for his safety and life if he informed corrections officials about the Blood gang members'

---

[3]   Presumably as another example of the violence in the prison the plaintiff declares that in October 2015 an inmate nicknamed Slicknick "stabbed Blood T for robbing him" of "his cell phone.  Slicknick was locked up and informed" SCCF officers "what happened."  (*Id.* at 23).

orders. (*Id.* at 31). He declares "SCCF punishes inmates for informing its employees of acts of violence done to them and refuses to act in a reasonable manner." (*Id.*). Because of the inmate-on-inmate violence "due [to] matters involving those with enemies," the plaintiff did as the Blood gang members ordered. (*Id.*). He "informed Lt. Gray that he owed a storeman (inmates who loan money with interest), and was given a disciplinary" infraction. (*Id.*).

The plaintiff remained in segregation from November 2015 until February 2016, when Blood T "was locked up for more acts of violence on inmates." (*Id.* at 33). This incident involved Blood T and his "cousin/gang member/crime partner," whose nickname is "Black Jesus." (*Id.* at 34). Black Jesus was stabbed while he and Blood T were trying to rob inmates Huckabuck and Leon in population cell number P2-28. (*Id.*).

The plaintiff believed the February 2016 incident would cause Blood T to be placed in "close custody," a status that would require him to remain "in segregation for a minimum of one (1) year." (*Id.*). Immediately before he was released back into population, the plaintiff requested a segregation review board meeting. (*Id.*). At that meeting, the plaintiff finally told Warden Specks, Captain Peters, Lt. Northcutt and SCCF Classification Head Ms. Estell the truth about why he was in lockup. (*Id.*). He stated that it was "not because he owed money to an inmate storeman and couldn't pay, but because Blood T directed his gang members

14

to force the plaintiff into lock up so that he could be released to population.  (*Id.* at 35).  The segregation board responded by telling the plaintiff that it would remove Blood T from his enemy list so that he "would not have more problems with the gang."  (*Id.*).  At that time, Blood T had been in segregation for nine weeks, and because the plaintiff told the truth, he was released back into population cell P2-28. (*Id.* at 34-35).

The plaintiff discovered he was mistaken about Blood T's status as a close custody inmate, meaning Blood T was eligible for release into population.  (*Id.*). He also discovered Blood T was not removed from his enemy list as promised. (*Id.*).  These discoveries occurred on April 20, 2016, when inmate Jeremiah Jackson led an assault against the plaintiff so that Blood T could be released into "general population after" either killing the plaintiff or having him placed in "lock-up."  (*Id.*).

The assault began when the plaintiff "came back from eating chow, and approached his cell."  (*Id.* at 36).  SCCF inmates use an ID card to open their "'locked'" cell door, and as he was unlocking his door, the plaintiff saw "inmate Jackson coming toward him, with others following."  (*Id.*).

As the plaintiff's "door was opening, all the involved inmates rushed" him, threw "a state inmate jacket over his head and physically forc[ed] him through the cell door into" his cell.  (*Id.*).  The inmates put the plaintiff "in a 'sleeper' hold,"

and "Jackson told" him "this was going to be the last time he would be the cause of Blood T being in lock" up.  (*Id.*).  The inmates then held the plaintiff's legs and arms and "tightened" the sleeper hold until he was unconscious.  (*Id.*).

When he came to, the plaintiff "discovered his commissary, radio," and "shower shoes had been taken."  (*Id.*).  The plaintiff "straightened up his cell," "stepped out into the dayspace and looked around," and "then went back in his cell."  (*Id.* at 36-37).  "Shortly thereafter," Jackson and his gang came back to the plaintiff's cell and asked "if he was going to segregation as he was told."  (*Id.* at 37).  The plaintiff said no.  (*Id.*).  Jackson asked the plaintiff if he had a knife.  (*Id.*).  The plaintiff did not and when he said no, "they started attacking" him, "stabbing him 16 or 17 times."  (*Id.*).  The plaintiff "was rushed to U.A.B. Hospital" and a "temporary tube was placed in his chest."  (*Id.*).  He received 28 staples and remained in the hospital until April 23, 2016.  (*Id.*).  That day, another inmate in his dorm was stabbed in the same manner.  (*Id.*).

Upon his hospital release, Sgt. Bruce Hodge "served" the plaintiff "with notice" that he was to be placed "in lockup for creating a safety, security, health hazard."  (*Id.*).  On April 25, 2016, the plaintiff and the other inmate who had been stabbed were transferred to Kilby Correctional Facility where he "was required to be in segregation due to his term of life without the possibility of parole."  (*Id.*).

The plaintiff declares incidents such as the one that happened to him could have been prevented if SCCF employees had:

a.    Transferred [the plaintiff] and or his enemies to different institutions immediately following the SCCF enemy validation [process];

b.    Employed a 'policy' and 'procedure' protecting his [identity] after informing SCCF employees" that his enemies had committed First Degree Robbery;

c.    Ensured more security staff was hired to provide adequate safety to inmates;

d.    Gained control over the high levels of gang activities to include, but not limited to, robbery, murder, assaults causing various degrees of physical violence;

e.    Reduced unmanageable population;

f.    Prosecut[ed] or caus[ed] to be prosecuted gang activities of reported robberies, assaults, and murders;

g.    Installed functional security cameras, so as to observe inmate activities;

h.    Compell[ed] security employees to adequately and properly conduct searches to reduce contraband; and

i.    Ha[d] all the [dysfunctional] cell doors fixed before" he was assaulted.

(*Id.* at 38).

The plaintiff alleges he was "nearly killed due to unprofessional decision making, lack of adequate security [and lack of] safety provided, overcrowding[, and] uncontrolled and or managed gang activities" at SCCF.  (*Id.*).  He claims all

of the defendants "known and unknown" are liable for "neglecting his Federal rights to be safe from preventable violence.  Had reasonable steps been taken within the authority, power, [and] discretion of SCCF employees and or staff," the plaintiff, "along with many others would not have been injured or killed." (*Id.* at 39).

### III. Analysis

**A.    42 U.S.C. §§ 1985 and 1986**

The plaintiff's claims under 42 U.S.C. §§ 1985 and 1986 (doc. 1 at 11) are without merit.   Section 1985 provides a federal cause of action only for conspiracies to deprive "any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).

> Section 1986 provides a cause of action against anyone who has "knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do."  42 U.S.C. § 1986.

*Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997).

Claims under § 1985 require a "purposeful conspiracy" to deprive an individual of equal protection of the law.  *Hanna v. Home Ins. Co.,* 281 F.2d 298,

303 (5th Cir. 1960).[4]   A racial or class-based animus is an essential element of such a conspiracy claim.  *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Asad v. Bush*, 170 F. App'x 668, 673 (11th Cir. 2006) (citing *Park*, 120 F.3d at 1167).

The plaintiff fails to allege any action was taken against him based on his race or his membership in some other protected class.  Similarly, the plaintiff fails to allege the race of any of the named defendants.  His failure to allege any facts tending to show a class-based animus on the part of any defendant is fatal to a § 1985 conspiracy claim.  *See Baskin v. Parker*, 602 F.2d 1205, 1208–09 (5th Cir. 1979).  Because "[t]he text of § 1986 requires the existence of a § 1985 conspiracy," *Park*, 120 F.3d at 1160, the plaintiff's claims based on §§ 1985 and 1986 are due to be dismissed.

**B.    42 U.S.C. § 1987/Criminal Charges**

The plaintiff "seeks the full prosecution of all liable Defendants" for "Federal Constitution[al]" violations, "criminal negligence" and "recklessness." (Doc. 1 at 11, 47) (citing 42 U.S.C. § 1987).  This court has no authority to act as a prosecutorial entity.  As such, it is without jurisdiction to refer any defendant to a federal or state agency for criminal prosecution.  *See United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000) ("The decision as to which crimes and criminals to

---

[4] Decisions by the former Fifth Circuit issued before October 1, 1981 are binding precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

prosecute is entrusted by the Constitution not to the judiciary, but to the executive who is charged with seeing that laws are enforced."). Furthermore, and to the extent the plaintiff declares the defendants failed to prosecute his perpetrators for the crimes committed against him, it is well settled that a private citizen has no "judicially cognizable interest in the prosecution or non-prosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375 (2nd Cir. 1973).

For the foregoing reasons, these claims are due to be dismissed for lack of jurisdiction and for failure to state a claim upon which relief can be granted.

## C.     42 U.S.C. §§ 1988 through 1990

The plaintiff's claims under 42 U.S.C. §§ 1988 through 1990 (doc. 1 at 11) are without merit. Section 1988 permits the court, in its discretion, to award attorney's fees to the prevailing party in any action "to enforce provision of [42 U.S.C.] sections 1981, 1981(a), 1982, 1983, 1985 and 1986." Section 1989 allows for an increase in "the number of United States magistrate judges, so as to afford a speedy and convenient means for the arrest and examination of persons charged with crimes under [42 U.S.C.] § 1987." Section 1990 requires "every marshal and deputy marshal" to "obey and executes all warrants or other process. . . issued under the provision of [42 U.S.C.] § 1989" when directed.

None of these sections creates an independent cause of action. As such, to

the extent the plaintiff relies on 42 U.S.C. §§ 1988 through 1990, he has failed to state any claims upon which relief can be granted.

## D.     Fictitious Parties

The plaintiff refers to "charging various known and unknown employees of the" ADOC for failing, or otherwise, recklessly, negligently, poorly, knowingly and or intentionally failing to reasonably provide sufficient security, safety, and conducive living quarters with adequate staffing for observing, cell checks routinely upon the hour, remaining inside the dorm, security searches to deter prison contraband and" homemade knives.  (Doc. 1 at 11).  He declares the "known and unknown" employees failed to act before he was injured "despite the level of violence" and charges "the Department and its employees for inadequately training staff, officers, supervisor to gain control and maintain order in a maximum security prison."  (*Id.*).  Elsewhere, the plaintiff attempts to "reserv[e]" for purposes of "amending, severing, added third party practice, joinder and misjoinder, any unknown name of ADOC employees, inmates with knowledge" as defendants.  (*Id.* at 18).

The plaintiff is advised that "as a general matter, fictitious-party pleading is not permitted in federal court." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010).  It is his responsibility to ascertain the name of each defendant he intends to sue in this action and indicate those names on the complaint form.  The

plaintiff is not allowed to make general allegations such as that set forth in the immediately preceding paragraph and then declare his desire to hold 'unknown employees' liable.  Such vague and conclusory allegations are insufficient to state a claim for relief.  Accordingly, the plaintiff's claims against "unknown employees" are due to be dismissed for failure to state a claim upon which relief can be granted.

A review of the defendants the plaintiff claims are "liable to" him on the complaint form shows that he has been able to identify the full name of many defendants.  (Doc. 1 at 13-18).  He is unaware of the given names of some defendants as he identifies them, for example, "Classification Specialist Jane Doe Estell, at SCCF."  (*Id.* at 17).  The absence of a given name does not make defendant Estell a fictitious party, nor is it necessary for the plaintiff to seek discovery in order set forth Estell's full name in an amended pleading.  In short, plaintiff's identification of any defendant by his or her title, surname, and location is more than sufficient for them to be a real party to this action.

The plaintiff identifies some defendants as "all unknown correctional[] officers assigned, on the date of the incident [April 20, 2016,] to work P2 Dorm, the cube of said dorm, supervisors on the shift, . . . at all times preceding the incident and the filing of this action."  (*Id.*).  To the extent he focuses on corrections officers and shift supervisors responsible for P2 Dorm on April 20,

2016, the plaintiff's description is sufficient to identify these defendants as real parties to the action.   Considering that the plaintiff is proceeding *pro se* and was transferred from SCCF immediately after he was released from the hospital on April 25, 2016, it is understandable that he cannot identify the officers assigned to work in P2 dorm on April 20, 2016, or their supervisors.   The plaintiff has correctly stated the unnamed officers and supervisors are fictitious and also "'provid[ed] an adequate description of some kind which is sufficient to identify the person(s).'"   *Dean v. Barber*, 951 F.2d 1210, 1216 (quoting *Keno v. Doe*, 74 F.R.D. 587, 588 n.2 (1977)).   That is all that is required to make the defendants real parties.

## E.   Statute of Limitations

In *Owens v. Okure*, 488 U.S. 235, 236, 249-50 (1989), the United States Supreme Court held that the proper statute of limitations for a § 1983 action is the forum state's general or residual statute of limitations for personal injury actions. The residual statute of limitations in Alabama is two years.   ALA. CODE § 6-2-38(l) (1975).[5]

Although state law determines the applicable statute of limitations, "[f]ederal law determines when the statute of limitations begins to run."   *Lovett v.*

---

[5] Section 6-2-38(l), ALA. CODE (1975), provides: "All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."

*Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003).  "Generally, 'the statute of limitations does not begin to run [*i.e.*, accrue] until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonable prudent regard for his rights.'"  *Id.* (quoting *Rozar v. Mollis*, 85 F.3d 556, 561-62 (11th Cir. 1996).  A plaintiff "must know or have reason to know that" he was "injured, and must be aware or should be aware of who inflicted the injury."  *Rozar*, 85 F.3d at 561 (citing *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987)).  "This rule requires a court first to identify the alleged injuries, and then to determine when plaintiff[] could have sued for them."  *Id.* at 562 (citing *Kelly v. City of Chicago,* 4 F.3d 509, 511 (7th Cir. 1993)).

According to the plaintiff, "the statute of limitations" began to run in November 2015.  (Doc. 1 at 23).  He declares the allegations prior to that date, while truthful, are "not an attempt to undermine statute of limitations" and "are not necessary" to prove his claims.  (*Id.* at 20 n.1).  "Moreover," he asserts, the "injury d[id] not occur[] until 2016."  (*Id.*).  Despite this disclaimer and reference to the April 20, 2016 stabbing as his injury, to a large extent the plaintiff is seeking relief pursuant to the Eighth and Fourteenth Amendment for various injuries that accrued more than two years before he filed the complaint in this action.

1.      **Eighth Amendment claims**

The plaintiff claims defendants "Specks, Estes, Northcutt, Estell, Graham, Malone, [and] Peters" violated his Eighth Amendment right to be free from cruel and unusual punishment because they were "clearly aware" of the existence of "his enemy situation" but nonetheless: (1) punished him and "compelled [him] to be treated cruelly" for reporting "the crime of robbery against his person and property," (2) "deprived him of protective custody placement" by housing him in administrative segregation, and (3) "failed to comply with ADOC policies involving validated enemies" before the April 20, 2016, assault.   (*Id.* at 39-43).

The punishment referred to by the plaintiff can only be the Summer 2013 disciplinary infraction defendant Graham instituted against him for creating a security hazard when he refused to identify the inmates who robbed him. (*Id.* at 21-22, 40-41).   The plaintiff was punished for the infraction even though he revealed the perpetrators' identities to defendant Malone once safely in segregation, Malone told Graham who the inmates were, and she questioned the inmates but did nothing else upon their denials. (*Id.*).   Although the plaintiff names Estes, Northcutt and Peters as defendants in connection with the infraction, he has not alleged they were personally involved in, aware of, or causally connected to it. (*Id.*).

25

The plaintiff's complaints about protective custody and ADOC enemy validation policies also originated in Summer 2013.  (*Id.* at 22, 29, 31-33, 40-41). During their investigation, the Enemy Validation Committee revealed the plaintiff's identity to the accused inmates, subsequently validated all three inmates as his enemies, and transferred all but inmate Blood T to another institution.  (*Id.* at 22, 32).  The plaintiff claims "the Wardens" could have instituted a policy and procedure to protect his identity from his enemies after the robbery, but they unreasonably failed to do so.  (*Id.* at 31).

The plaintiff admits ADOC's enemy validation "policy and procedure" only required enemy inmates to be "separated" and "SCCF's S.O.P." regarding enemies only "require[s] one (1) to be in segregation while the other [was] in general population."  (*Id.* at 29, 31).  However, he simultaneously complains that according to the ADOC's "Classification Manual, page[s] 55-58," once the enemy validation process was complete defendants Estell, Estes and Specks were supposed to transfer either him or all of his enemies from SCCF, but unreasonably failed to do so.  (*Id.* at 29, 31-33, 37).

Instead, once he completed his time in punitive segregation, the plaintiff "was deprived" of protective custody placement and required to remain in the more restrictive administrative segregation until inmate Blood T reentered segregation in April 2014.  (*Id.* at 32-33, 41).  The plaintiff infers that but for the disciplinary

infraction, he could have received protective custody placement, but provides no additional explanation. (*Id.* at 40). Between April 2014 and November 2015, the plaintiff was placed in segregation on at least one other occasion because inmate Blood T had been released into population. (*Id.* at 23, 33). Although named as defendants, there are no allegations to support any claims against Northcutt and Peters based on the Summer 2013 through November 2015 protective custody and enemy validation policy complaints.

Thus, as early as the Summer of 2013 and certainly no later than December 2013, the plaintiff knew he suffered the following injuries: (1) an unfair and poorly investigated 2013 disciplinary infraction, (2) placement in administrative segregation as opposed to protective custody after completing punitive segregation for the 2013 infraction, (3) the SCCF Wardens' decision not use their discretionary authority to implement a victim confidentiality policy during the enemy validation process, (4) ADOC's and SCCF's use of a separation policy in enemy situations as opposed to the ADOC Classification Manual's policy that enemies should be transferred to other prisons, and (5) the decision to transfer only two of the plaintiff's three enemies when transferring the plaintiff "immediately" would have been "'the least restrictive means and not intrusive to SCCF nor ADOC.'" (Doc. 1 at 21-23, 27, 29, 31-33, 37, 40-41).

Yet, he did not file the present action until June 15, 2017. (Doc. 1). As such, the foregoing claims, which accrued between December 2013 and June 15, 2015, are barred by the applicable statute of limitations and are due to be dismissed. The plaintiff does not set forth any claims concerning any injuries that occurred between June 16 and November 2015.

### 2. Fourteenth Amendment

#### a. Due Process

##### i. Transfer to another institution

To the extent the plaintiff declares his right to due process of law was violated when the defendants failed to "afford[] him a hearing" to "effectuate" his "immediate transfer" or the transfer of all of enemies from SCCF as soon as the validation process was complete, the claim is barred by the applicable statute of limitations. (*Id.* at 44). Additionally, the claim is without merit. "[I]nmates usually possess no constitutional right to be housed at one prison over another. . . . Accordingly, the Supreme Court has found no constitutionally based liberty interest in the involuntary transfer of a prisoner to a different facility." *Barfield v. Brierton*, 883 F. 2d 923, 936 (11th Cir. 1989) (citing *Meachum v. Fano*, 427 U.S. 215 (1976); *Montayne v. Haymes*, 427 U.S. 236 (1976)).

To the contrary, prisoners can be transferred from one prison to another with or without a reason without invoking the right to a due process hearing prior to

transfer. *Meachum*, 459 U.S. at 225 ("[T]he Due Process Clause in and of itself[, does not] protect a duly convicted prisoner against transfer from one institution to another within the state prison system."). The ability to transfer prisoners is essential to prison management and to require hearings for such transfers would impermissibly interfere with prison administration. *Id.* *See Olim v. Wakinekona*, 461 U.S. 238, 248 (1983) (holding that an interstate transfer did not deprive inmate of any liberty interest protected by the Due Process Clause).

"Whatever expectation a prisoner may have in remaining at [or leaving] a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." *Meachum*, 427 U.S. at 228. Because the plaintiff does not have a constitutional right to be housed in a particular prison, or demand an institutional transfer to another prison, he does not have a constitutional right to notice and a hearing. *See Montayne*, 427 U.S. at 242 ("no Due Process Clause liberty interest of a duly convicted prison inmate is infringed when he is transferred from one prison to another within the State, whether with or without a hearing[.]").

### ii.   Property

Also barred is the plaintiff's claim that the defendants failed to protect his property or implement a procedure to have it returned in the Summer of 2013.

(Doc. 1 at 44).   The plaintiff was well aware of each of these injuries in 2013 but did not file the current action until June 2017.

Additionally, and to the extent the plaintiff may be alleging the defendants failed to protect his property or implement a procedure to have it returned in April 2016, he has failed to state a claim upon which relief can be granted.

> [T]he Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty, or property.   Where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required.

*Davidson v. Cannon,* 474 U.S. 344, 347-48 (1986) (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986).   Moreover,

> an unauthorized, intentional deprivation of property by a state employee does not constitute a violation of the due process requirements of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available.

*Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

The plaintiff was not deprived of property without due process of law. Section 41-9-60 of the Code of Alabama provides for the State Board of Adjustment to consider claims against the state or its agents.   Because the defendants are agents of the State of Alabama, the plaintiff has a remedy under the state statute.   If the Board of Adjustment denies the claim, the plaintiff may then bring an action in Alabama state court for redress.   *See Carmichael v. State Board of Adjustment*, 232 So. 2d 216 (Ala. 1947).

The post-deprivation remedies available to the plaintiff under Alabama tort law satisfy due process.  Regardless of whether the alleged deprivation was unintentional or intentional, the plaintiff has not been deprived of property without due process of law because he had a legal means whereby he could have been heard on this claim for compensation.  Therefore, his due process claim regarding the loss of his property in  is due to be dismissed under § 1915A (b)(1) for failure to state a claim.

### iii.    Grievance Procedure

The plaintiff's claim that ADOC's failure to implement "a reasonable grievance procedure for inmates to report safety violations" (*id.* at 45) fails to state a claim upon which relief can be granted. The Eleventh Circuit has plainly stated that "a prisoner does not have a constitutionally-protected liberty interest in an inmate grievance procedure." *Thomas v. Warner*, 237 F. App'x 435, 437-38 (11th Cir. 2007); *see also Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) ("There is no legitimate claim of entitlement to a grievance procedure."); *Baker v. Rexroad*, 159 F. App'x 61, 62 (11th Cir. 2005) ("the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance") (quoting *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)).

31

### b.    Equal Protection

The plaintiff claims the defendants deprived him "of the equal protection" of Federal Law and the ADOC regulations and procedures set out in AR 435 and "Classification Manual, pages 55-58," all of which were "design[ed] to protect him after he had his enemies validated." (Doc. 1 at 46-47). To the extent the plaintiff refers to events occurring between Summer and December 2013, this claim is barred by the applicable statute of limitations.

Additionally, "[t]o establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." *Sweet v. Secretary, Dep't of Corr.*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006) (citing *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)).

The plaintiff has not identified any SCCF victimized inmate in the same enemies' list position as him that received more favorable treatment, *i.e.* transfer to another facility or protective custody status. In fact, the one inmate ("Birdman") he specifically identifies as being similarly situated was treated in exact same manner as the plaintiff and was murdered. (Doc. 1 at 30). Nor has the plaintiff

alleged facts to establish that any differential treatment he received was because of his race, religion or national origin.  Accordingly, the plaintiff's has failed to state an equal protection claim against any defendant.

## F.    Sovereign Immunity

To the extent the plaintiff requests monetary or equitable relief against the ADOC and individual defendants in their official capacities, his claims are due to be dismissed.   A law "suit against the State [of Alabama] and its [agencies] is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit." *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459 (1945); *Worcester County Trust Co. v. Riley*, 302 U.S. 292 (1937)).  No such consent can "be given under Art. I, Sec. 14, of the Alabama Constitution, which provides that 'the State of Alabama shall never be made a defendant in any court of law or equity.'" *Id.*; *see also*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984).  Further, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is not different from a suit against the state itself." *Will v. Michigan Dep't Of State Police*, 491 U.S. 58, 71 (1989) (citation omitted).

Because Governor Ivey is a State of Alabama employee, the ADOC is an agency of the State of Alabama, and the remaining defendants are ADOC

employees, to the extent the plaintiff names Governor Ivey, the ADOC, Prison Commissioner Jefferson Dunn, Warden Dewayne Estes, Warden Specks, Classification Specialist Estell, Lt. Northcutt, Captain Carol Graham, Captain Malone, Warden (formerly Captain) Kenneth Peters, and the unknown corrections officers and supervisors responsible for P2 dorm on April 20, 2016, as defendants in their official capacities, Eleventh Amendment immunity prohibits the plaintiff's suit for monetary damages.

## G.    Governor Kay Ivey

The plaintiff names Governor Kay Ivey as a defendant because she is "[t]he Head of ADOC" and is authorized "to exercise such functions and duties" herself "or through such 'administrative divisions' or such officers or employees as" she "may designate." (Doc. 1 at 13) (citing Ala. Code §§ 14-1-15 through 14-1-16 (1975)).   He blames Ivey for failing to adequately train ADOC employees, demand their compliance with Federal and State law, provide adequate security, and  control SCCF's poor management prior to the April 20, 2016.  (*Id.* at 13-15). The plaintiff declares that he "does not seek monetary damages against" Ivey "nor will he at a later time."  (*Id.* at 15).

The plaintiff is attempting to implicate defendant Ivey through the concept of *respondeat superior.*   However, "[t]here is no *respondeat superior* liability under §1983."  *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995) (citing *Monell*

*v. Department of Social Services*, 436 U.S. 658, 690-92 (1978) and *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994)). Absent some allegation that defendant Ivey knew of, sanctioned, participated in or was otherwise "affirmatively linked" to the acts here complained of, the claims against Ivey are insufficient to state a cause of action under 42 U.S.C. § 1983.  *See Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 (11th Cir. 1985), *cert. denied*, 476 U.S. 1115 (1986).

The plaintiff's attempts to causally connect Ivey to his claims fail not only because they are conclusory, but also because all allegations underlying his claims occurred on or before April 20, 2016, and he was transferred away from that facility on April 25, 2016.  (Doc. 1 at 5, 8, 37).  Kay Ivey did not become Governor of the State of Alabama until April 10, 2017.[6]  Thus, the plaintiff's claims against Governor Ivey are factually and legally impossible.  Accordingly, all claims against Governor Ivey are due to be dismissed.

## H.    Federal Constitutional Law

### 1.    Eighth Amendment – General Standard

In order to establish an Eighth Amendment violation, a plaintiff "must prove three elements: (1) a condition of confinement that inflicted unnecessary pain or suffering [constituting cruel and unusual punishment], *Rhodes v. Chapman*, 452

---

[6] http://www.archives.alabama.gov/govslist.html.

U.S. 337, 347 (1981), (2) the defendant[s'] 'deliberate indifference' to that condition, *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), and (3) causation, *Williams v. Bennett*, 689 F.2d 1370, 1389-90 (11th Cir. 1982)." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (footnotes and parallel citations omitted). Whether a particular condition of confinement constituted cruel and unusual punishment is an objective inquiry; whether jail officials were deliberately indifferent to that condition is a subjective inquiry. *See Wilson*, 501 U.S. at 298.

With regard to the objective inquiry, it is well established that prison conditions amount to cruel and unusual punishment only when they result in "unquestioned and serious deprivation of basic human needs." *Rhodes*, 452 U.S. at 347. While it is the duty of prison officials to furnish prisoners with "reasonably adequate food, clothing, shelter, sanitation, and necessary medical attention," *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977), *rev'd in part on other grounds*, 438 U.S. 781 (1978),[7] "the Constitution does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349. Accordingly, "'*extreme* deprivations are required to make out a conditions-of-confinement claim' under the Eighth Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1298 (11th Cir. 2004) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). The plaintiff "'must at the very least

---

[7] Decisions by the former Fifth Circuit issued before October 1, 1981 are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

show that a condition of his confinement poses an unreasonable risk of serious damage to his future health' or safety." *Id.* at 1289 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

As to the subjective inquiry,

> The Supreme Court says that prison officials will be liable for violating the Eighth Amendment when they are deliberately indifferent to the substantial risk of serious harm to inmates. Put differently, officials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk. *See Farmer v. Brennan,* 511 U.S. 825 (1994).

*Marsh v. Butler Co., Ala.,* 268 F.3d 1014, 1026-27 (11th Cir. 2001) (parallel citation omitted).

### 2.      Safe and Secure Conditions of Confinement

The Eleventh Circuit has "stress[ed] that a 'prison custodian is not the guarantor of a prisoner's safety.'" *Purcell ex rel. Estate of Morgan v. Toombs Co., Ga*, 400 F.3d 1313, 1321 (11th Cir.  2005) (quoting *Popham v. City of Talladega,* 908 F.2d 1561, 1564 (11th Cir. 1990)).   Instead, "[w]ithin [a prison's] volatile 'community,' prison administrators are . . . under an obligation to take *reasonable measures* to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) (first alteration and emphasis supplied).  Therefore, not "every injury suffered by one prisoner at the hands of another that translates into [a] constitutional liability...." *Purcell ex rel. Estate of Morgan v. Toombs Co., Ga*,

400 F.3d 1313, 1319 (11th Cir. 2005) (quoting *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (citations omitted)).[15]

In order for constitutional liability to attach, "a prisoner-plaintiff must first demonstrate 'an objectively substantial risk of serious harm to prisoners.'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Marsh v. Butler Co., Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001)).  This is accomplished by alleging facts to show the existence of "an excessive risk of inmate-on-inmate violence at" a prison *i.e.*., an atmosphere where "'violence and terror reign'" or the "'threat of violence'" at the hands of other inmates is "'constant.'"  *Purcell*, 400 F.3d at 1320 (quoting *Woodhaus v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973) (citation omitted)).  Conversely, "'occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment.'"  *Id.*

The plaintiff's description of inmate life in SCCF general population dorms in 2015 and 2016 (and possibly earlier) is more than sufficient to establish the existence of a constant and excessive risk of inmate-on-inmate violence at the facility.  That description includes specific allegations concerning overcrowding, understaffing, underfunding, inadequate training, abandonment of posts and duties by corrections officers without repercussion, lack of visual monitoring, inoperable locks on cell doors, unmanageable gang activities associated with significant amounts of drugs, cell phones, and other contraband in the institution, and rampant

inmate-on-inmate violence, including stabbings and murder. SCCF "was so uncontrolled" that corrections staff were "more afraid and fearful than the inmates to intervene in what looked of danger." (Doc. 1 at 30). Such conditions indicate SCCF was a prison where violence and terror reigned.

These grave constitutional infirmities were so ubiquitous that every defendant, from Prison Commissioner Jefferson Dunn down to the unknown corrections officers assigned to work P2 Dorm on April 20, 2016, had to be subjectively aware of the substantial risk of harm to general population SCCF inmates. Yet, each defendant, within his or her power and authority to do so, failed to take reasonable remedial action(s) to reduce the severe "lack of due care, safety, and security and violent pattern of deadly or otherwise assaults." (*Id.* at 17). As a result, the plaintiff was beaten, robbed, and nearly stabbed to death.

SCCF enemy validation policies were another infirmity. The plaintiff alleges "the failure to comply with ADOC policies involving validated enemies" before the April 20, 2016, assault "'created . . . a security, safety, [and] health hazard." (*Id.* at 41). Since he admits AR 435 required only that enemies be separated and admits he was in fact separated from the three inmates either by transfer or by separate housing at SCCF, the plaintiff is referring to a failure to comply with the ADOC Classification Manual's requirement that enemies be transferred to separate facilities.

Nonetheless, interpreting his allegations broadly, the plaintiff may be claiming that, at least with regard to 2015 and 2016, the use of the separation policy and failure to utilize the transfer policy by Classification Specialist Estell and Wardens Estes and Specks resulted in the strong likelihood that he would be at a substantial risk of serious harm by Blood T's gang while enemy Blood T was in segregation. (*Id.* at 17, 32-33). In support thereof, he asserts "a vast majority of the stabbings at SCCF involved enemy situations 'KNOWN' by SCCF security staff or employees." (*Id.* at 41-42). As an example, he declares that in October 2015 inmate "Birdman" was killed because he would not sign the form to retract an enemy who wanted to be released from segregation. (*Id.* at 29-30, 42). Although he did not notify any defendants at the time, the plaintiff himself was forced into segregation in November 2015 by Blood T's gang in order for Blood T to gain release into population. (*Id.* at 31).

Considering the other infirmities in the prison, the undersigned concludes the plaintiff has alleged sufficient facts to establish that defendants Estell, Estes and Specks knew in 2015 and 2016, if not before, that use of the separation policy would result in a strong likelihood that a victimized inmate with an enemy housed in segregation (particularly the known leader of a gang) would be victimized again by other general population inmates (gang members) for the benefit of the segregated enemy inmate. Further, in February 2016, the plaintiff told Warden

Specks, Captain Peters, Lt. Northcutt and Classification Head Ms. Estell that he was not in lockup because he committed a disciplinary infraction, but because Blood T and his gang members had forced him to lockup.  (Doc. 1 at 34).

The Board told the plaintiff that Blood T would be removed from his enemies list so that he would have no further trouble from the gang.  (*Id.* at 35).  However, in contravention of ADOC's enemy validation policy and their promise the Board defendants did not retract inmate Blood T from the plaintiff's enemy list.  Nor did defendants Estell, Estes and Specks transfer the plaintiff away from SCCF.  (*Id.* at 17, 33).  Such allegations are sufficient to establish that defendants Specks, Peters, Northcutt and Estell were subjectively aware of a substantial risk of harm to the plaintiff in general population, but recklessly failed to take reasonable steps to abate that risk.  Defendants Specks, Peters, Northcutt and Estell should be directed to respond.

## I.     Alabama State Law

The plaintiff claims he was "deprived of equal protection of State" law, "ADOC Rules and Regulations," and "available procedures design[e]d to protect him after he had enemies validated in violation of the Fourteenth Amendment of the Federal Constitution's Protection."  (*Id.* at 46).  It is not clear whether the plaintiff is attempting to set forth independent state law claims against the defendants, but if he is, his claim that he was deprived of equal protection under

State law and ADOC Rules and Regulations is due to be dismissed because "'there is no equal protection clause in the [Alabama] Constitution of 1901.'" *Ex parte Melof*, 735 So. 2d 1172, 1186 (Ala. 1999) (quoting *Opinion of the Judges No. 102*, 41 So. 2d 775, 777 (1949)). "Even if a state equal protection claim exists, it would be analyzed under the same standard as a federal equal protection claim." *Wallace v. Jones*, No. 2:10-CV-361-MEF, 2013 WL 5406799, at * 10 n.11 (M.D. Ala. Sept. 25, 2013) (citing *Dyas v. City of Fairhope,* No. 08–0232–WS–N, 2010 WL 5477754, at *2–3 (S.D. Ala. Dec. 30, 2010)). Since the plaintiff's federal equal protection claim is due to be dismissed, this claim also is due to be dismissed for failure to state a claim upon which relief can be granted.

## IV. Recommendation

For the reasons stated above, the undersigned **RECOMMENDS** all claims in this action, except the Eighth Amendment conditions of confinement claims against defendants Dunn, Estes, Specks, Estell, Northcutt, Graham, Malone, Warden (formerly Captain) Peters, and all correctional officers assigned to work P2 Dorm and all supervisors on April 20, 2016, be **DISMISSED WITHOUT PREJUDICE**, pursuant to 28 U.S.C. § 1915A(b)(1), for failing to state a claim upon which relief can be granted. The undersigned **FURTHER RECOMMENDS** the remaining claims be **REFERRED** to the undersigned for further proceedings.

### V. Notice of Right to Object

The plaintiff may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered.  Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objection. Failure to object to factual findings will bar later review of those findings, except for plain error.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).  Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

On receipt of objections, a United States District Judge will make a *de novo* determination of those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the findings of fact and recommendations made by the magistrate judge.  The district judge also may refer this action back to the magistrate judge with instructions for further proceedings.

The plaintiff may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  The plaintiff may only appeal from a final judgment entered by a district judge.

**DATED,** this 20th day of November, 2017.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge